Dealers Elec v. Williams Ind. 






AFFIRMED
APRIL 30, 1990

NO. 10-89-040-CV
Trial Court
# 88-949-3
IN THE
COURT OF APPEALS
FOR THE
TENTH DISTRICT OF TEXAS
AT WACO

* * * * * * * * * * * * *

DEALERS ELECTRICAL SUPPLY CO., INC.,
   Appellant
v.

WILLIAMS INDUSTRIES, ET AL,
   Appellees

* * * * * * * * * * * * *

 From 74th Judicial District Court
McLennan County, Texas

* * * * * * * * * * * * *

O P I N I O N

* * * * * * *
This is an appeal by plaintiff Dealers Electrical Supply Co.,
Inc. ("Dealers"), from a take-nothing judgment in its suit against
defendants, Williams Industries ("Williams"), and Hartford
Insurance Company ("Hartford"). Trial was before the court. 
Dealers assigns 14 points of error, which we shall group topically
and discuss why each must be overruled. We will then affirm the
judgment of the trial court. 
Dealers sued Fort Bend Electric ("Fort Bend"), Williams, and
Hartford to enforce its claims to payment for electrical materials
provided to Fort Bend for use in construction on the "Beto" and
"Trusty Camp" units of the Texas Department of Corrections. Fort
Bend was subsequently severed out of the case. As to construction
at both units, Fort Bend was the electrical subcontractor, Williams
was the general contractor, and Dealers was the supplier of
electrical materials. Dealers claimed it had not been paid $8,421
for materials used at the "Beto" unit and $18,093 for materials
used at the "Trusty Camp" unit.
Upon the close of Dealers's case, Williams and Hartford moved
for a verdict that Plaintiff take nothing. The trial court granted
such motion and rendered judgment accordingly. Thereafter, the
trial judge filed findings of fact and conclusions of law, the
pertinent parts of which are summarized as follows:
Findings of Fact
 
1 and 2: Williams contracted with the State of Texas for 
the construction of Department of Corrections Units known
as the "Beto Unit" and the "Trusty Camp Unit."

3, 4, and 5: Fort Bend subcontracted with Williams to do
the electrical work on the two units.
 
6 and 7: Dealers supplied non specially-fabricated
materials to Fort Bend for use on the two units.
 
8 and 9: Williams was the general prime contractor for
both of the units.
 
10 and 11: Fort Bend was the electrical subcontractor to
Williams on both units.
 
12 and 13: Dealers was a material supplier to Fort Bend for
Fort Bend's subcontract with Williams on both units.
 
14 and 15: Dealers had no direct contractual relation-
ship with Williams for material supplied for the
construction of the two units.
 
16 and 17: Dealers gave written notice to Williams by
certified mail of its claims on the two units on July 15,
1987; but gave no other written notice.
 
18 and 19: Dealers's claim against Williams and Hartford on
the "Beto Unit" was $4,800.54; and on the "Trusty Camp Unit"
was $16,131.89.
 
20 and 21: No materials were delivered by Dealers for
either unit during or after May 1987, for which Dealers
claims it was not paid.
 
22 and 23: Williams paid Dealers a total of $233,247.98
for materials used in construction of the two units, of
which Dealers turned over $104,983.80 to Fort Bend,
without giving Williams credit therefor.

  24: Of the $104,983.80 Dealers turned over to Fort Bend, $31,727.40 was paid by Williams on May 21, 1987.

25: Williams has paid all amounts to Dealers which Dealers claims are owed on the two units.

26: Dealers failed to give Williams credit for all amounts paid by Williams to Dealers on the two units.
 
27: Dealers did not incur any reasonable and necessary
attorneys fees in connection with trial or appeal of this
case. 

28 and 29: Hartford did not act as a surety on any payment bond on the two units.

Conclusions of Law
 
30: Dealers' claim against Williams and Hartford was
based only on Article 5160, Tex. R. Civ. Stat.
 
31: Dealers was required to notice Williams of amounts
claimed on or before the 36th day following the 10th day
of the month following delivery of materials for which it
claims it was not paid, before it could enforce any right
of action against Williams pursuant to Article
5160B(b)(2), Tex. R. Civ. Stat.
 
32: Dealers' notice to Williams of July 15, 1987, would
only be sufficient to support recovery by Dealers for
materials delivered in May 1987, for which it had not
been paid. 
 
33: Dealers failed to give sufficient notice to Williams
of the claims pursuant to Article 5160B(b)(2), Tex. R.
Civ. Stat.
 
34: The amounts claimed by Dealers to be due from
Williams are not just, true, and due.
 
35:Williams is entitled to credit for amounts paid
jointly to Dealers and Fort Bend.
 
36:Dealers is not entitled to recover any amounts by way
of its cause of action against Williams and Hartford.

Dealers' 14 points of error may be profitably summarized as 

follows:

(1) The trial court erred in finding that Dealers had no
direct contractual relationship with Defendants for the
construction of the Beto and Trusty Camp Units, because the
evidence conclusively established the opposite. (Findings 14,15).

(2) The trial court erred in finding that no materials were
delivered by Dealers for either unit during or after May 1987, for
which Dealers was not paid, because the evidence established that
materials were delivered to the Trusty Camp Unit from 4/27/87
through 5/21/87, and to the Beto Unit from 4/24/87 through 5/18/87. 
(Findings 20, 21).

(3) The trial court erred in finding that Dealers was paid
$233,247.98 for material for the two units, because the evidence
conclusively established that Dealers did not receive all of such
funds, nor were such funds paid during a period relevant to
Dealers' claim. (Finding 22).

(4) The trial court erred in finding that Dealers turned over
$104,983.80 of such $233,247.98 to Fort Bend without giving
Williams credit therefor, because such finding is against the great
weight and preponderance of the evidence. (Finding 23).

(5) The trial court erred in finding that Dealers turned over
to Fort Bend $31,727.40, on May 21, 1987, because the
uncontroverted evidence shows that such payment was for invoices
through 4/20/87. (Finding 24).

(6) The trial court erred in finding Williams had paid all
amounts due and owing to Dealers on the two units because the only
evidence shows payment for invoices through April 20, 1987. 
(Finding 25).

(7) The trial court erred in finding that Dealers incurred no
attorney's fees because the finding is against the great weight and
preponderance of the evidence. (Finding 27).

(8) The trial court erred in finding that Hartford did not
act as a surety on any payment bond on the two units. (Findings
28, 29).

(9) The trial court erred in concluding that Dealers was
required to give the "36 day rule" notice, because Dealers was in
contractual relationship with Williams and the "90 day rule"
applied. (Conclusion 31).

    (10) The trial court erred in concluding that the July 15,
1987, notice would only be sufficient to support recovery for
materials delivered in May 1987, because Dealers was in contractual
relationship with Williams, and the July 15, 1987, notice covered
all deliveries in April, May, and June 1987, under the "90 day
rule." (Conclusion 32).

    (11) The trial court erred in concluding that Dealers failed
to give sufficient notice to Williams of the claim under Article
5160B(b)(2) Tex. R. Civ. Stat., because the only evidence shows
proper notice on July 15, 1987, well within the "90 day rule." 
(Conclusion 33).

    (12) The trial court erred in concluding that the amounts
claimed by Dealers are not just, true, and due, because the only
evidence shows Dealers to be entitled to either $16,131.89 and
$4,800.54, or the amounts of $18,093.24 and $8,421.20. (Conclusion
34).

    (13) The trial court erred in concluding that Williams is
entitled to credit for the amounts paid jointly to Dealers and Fort
Bend, because it is uncontroverted that Williams has paid upon no
invoices for materials delivered after April 20, 1987. (Conclusion
35).

    (14) The trial court erred in concluding that Dealers is not
entitled to recover any amounts against Williams and Hartford
because such conclusion is against the great weight of the
evidence. (Conclusion 36).

We address first Dealers's points 1, 2, 9, 10, 11, 12, and 14. 
Williams, the contractor, is liable to all who have furnished
material directly to him. However, as to derivative claimants who
have furnished material to a subcontractor, the obligation arises
by virtue of the statutes, and in order to recover against the
contractor as well as against the surety, the derivative claimant
must file his itemized claims in compliance with the statute. 
The statute relevant to this case provides for a 36-day notice
for a claimant who does not have a contractual relationship with
the contractor and for a 90-day notice for a claimant who has a
contractual relationship with the contractor. Both provisions
require that notice be given 36 or 90 days, as the case may be,
from the date of delivery of the materials. See TEX. REV. CIV.
STAT. ANN. art. 5160B(a),(b) (Vernon 1987).
  Plaintiff here failed to offer any evidence of the date it
delivered the materials involved. See Rife Constr. Co. v. Brans,
298 S.W.2d 254, 262 (Tex. Civ. App.--Dallas 1956, writ ref'd
n.r.e.); Metropolitan Cas. Ins. Co. of New York v. Texas Sand &
Gravel Co., 68 S.W. 2d 551, 553 (Tex. Civ. App.--Waco 1934, writ
dism'd). Dealers, having failed to show the date of delivery of
the materials furnished the subcontractor, has failed to show that
it gave timely notice of its claim. Thus it has failed to
establish its derivative claim against Williams. Points 1, 2, 9,
10, 11, 12, and 14 are overruled.
We next address Plaintiff's points 3, 4, 5, 6, and 13. To
review, these points assert that the trial court erred in finding
that Plaintiff was paid $233,247.98; that Plaintiff turned over
$104,983 of said sum to Fort Bend without giving Plaintiff credit
therefor; that Plaintiff turned over $31,727 on May 21, 1987; that
Williams had paid all amounts owing to Plaintiff on the two units;
and that Williams is entitled to credit for the amounts paid
jointly to Dealers and Fort Bend.
Dealers failed to prove the date of delivery of the materials
furnished. Without such proof, Dealers could not prove that it
gave either the 36-day or the 90-day notice, nor could it establish
a derivative cause of action against Williams. Moreover, the
evidence shows Williams paid Dealers a total of $233,247.98 for
materials used in the construction of the two units, $104,983.80 of
which Dealers turned over to Fort Bend. The evidence is undisputed
that Dealers endorsed the checks and turned them over to Fort Bend
without giving Williams any credit therefor. Finally, the trial
court concluded, with justification, that Williams was entitled to
credit for the amounts paid jointly to Dealers and Williams. 
The issuance and acceptance of checks payable jointly to a
supplier and a subcontractor constitute payment by the contractor
to the supplier so as to preclude enforcement of a materialman's
lien. Friedman Steel Sales, Inc. v. Texas Utilities Co., 574
S.W.2d 849 (Tex. Civ. App.--Texarkana 1978, writ ref'd n.r.e.); F.
& C. Engineering Co. v. Texas Utilities Co., 300 S.W.2d 323, 327
(Tex. Civ. App.--San Antonio 1957, writ ref'd n.r.e.). Points 3,
4, 5, 6, and 13 are overruled. Points 7 and 8 become immaterial
under our view of the case, and are overruled.
The judgment of the 74th Judicial District Court, McLennan
County, Texas, is affirmed.
                    
                                            
                                Terry R. Means
DO NOT PUBLISHJustice



ry beneficiary of the policy to be
retained as such as long as the policy remains in effect.
 
The value of the real properties listed in Exhibit "A" was estimated at $825,000.00. Exhibit "B"
listed personal properties with an estimated value of $1,778,379.48. Listed in Exhibit "C", the
properties belonging to Lynda prior to her marriage to Charles, were a 1978 Buick Regal, whose
value was not indicated; a coin set with accompaniments worth approximately $1,095.00; life
insurance policies for Lynda and her two daughters whose values were not indicated; and a
contingent interest in the proceeds from a personal injury lawsuit whose estimated value was not
indicated.
          Notwithstanding either the intention of Lynda in entering the agreement or the express
wording thereof, she argued to the trial court by means of a suit for declaratory judgment that the
agreement failed to divide the marital estate so as to allow each party to characterize the income



from his or her separate property as separate property. The trial court entered judgment in her
favor.
          The source of Charles's and Lynda's conflict is the sole constitutional provision in this
state governing the proper characterization of marital property as either separate or community
property, article XVI, section 15. See Tex. Const. art. XVI, § 15 (1948, amended 1980). On
the date the Whites were married, which simultaneously served as the effective date of their
prenuptial agreement, article XVI, section 15, provided:
All property, both real and personal, of a spouse owned or claimed before marriage, and
that acquired afterward by gift, devise or descent, shall be the separate property of that
spouse; and laws shall be passed more clearly defining the rights of the spouses, in
relation to separate and community property; provided that persons about to marry and
spouses, without the intention to defraud pre-existing creditors, may by written instrument
from time to time partition between themselves all or part of their property, then existing
or to be acquired, or exchange between themselves the community interest of one spouse
or future spouse in any property for the community interest of the other spouse or future
spouse in other community property then existing or to be acquired, whereupon the portion
or interest set aside to each spouse shall be and constitute a part of the separate property
and estate of such spouse or future spouse; and the spouses may from time to time, by
written instrument, agree between themselves that the income or property from all or part
of the separate property then owned by one of them or which thereafter might be acquired,
shall be the separate property of that spouse; and if one spouse makes a gift of property
to the other that gift is presumed to include all the income or property which might arise
from that gift of property.




Id. It is undisputed that article XVI, section 15, allows prospective spouses to recharacterize their
community interests in the income generated from the other's separate property as separate
property, provided the prospective spouses either partition or exchange those interests. See id. 
Charles argues that the prenuptial agreement accomplished an exchange of community interests
in the income generated from the other's separate property and, therefore, is enforceable under
article XVI, section 15. Lynda, however, contends the agreement did not involve either a
partition or an exchange of community interests and, consequently, is unenforceable under article
XVI, section 15. She raises two arguments in support of her contention; first, she argues our
reasoning in Fanning v. Fanning, 828 S.W.2d 135 (Tex. App.—Waco 1992), rev'd on other
grounds, 847 S.W.2d 225 (Tex. 1993), demands a decision in her favor; second, she contends the
language of the agreement reveals solely an attempt by both parties to define the property each
spouse brought into the marriage as separate property, not to effectuate a partition or exchange
of each other's community interests.
I. Whether Fanning Compels a Decision in Lynda's Favor
          This court previously addressed in Fanning the enforceability of prenuptial agreements
under article XVI, section 15, where the future spouses appear to have attempted to exchange their
community interests in the income derived from each other's separate property. At issue in
Fanning were two separate and distinct paragraphs from the parties' prenuptial agreement. They
read:
6.01) During their marriage, all income and revenue (other than that which is part of the
property itself) from the separate property of each party hereto is the community property
of the parties if so defined by Texas law. However, the parties understand that the 66th
Texas legislature approved H.J.R. 54, to be submitted to the voters on November 1980,
by the terms of which spouses may, by agreement between themselves, provide that the
income from separate property owned by either of them, or thereafter acquired, shall be
the separate property of the spouse owning such separate property. If such amendment to
Article XVI, Section 15, of the Texas Constitution is approved by the voters, the parties
agree that as soon as legally possible all income from their respective estates shall be the
separate property of the spouse from whose separate estate such income is derived. 
6.02) The parties agree that each may, from time to time, designate certain banks as his
or her agent to assist in carrying out this Agreement by administering accounts in the name
of the respective party, by the name of the party adding "as separate property," or
otherwise, to the end that all funds which are deposited to the separate accounts of the
parties hereto and income therefrom will be identified as the separate property of the party
in whose name such funds are held. As received, the respective parties shall deposit funds
received that are the income or revenue from their respective separate property into one
of their respective several or separate property accounts created in their respective and on
deposit (if not before) such funds shall be the separate property of the spouse whose
separate property produced such income or revenue, if so provided by this Agreement. 
The parties hereto hereby instruct any bank holding such funds on deposit as provided in
this paragraph that such funds are the separate property of the party in whose name such
deposit was made as provided in this paragraph.

Fanning, 828 S.W.2d at 139-140. While each of the two paragraphs evinces an attempt by both
parties to recharacterize the income from their separate property as separate property, we held
only the latter paragraph enforceable under article XVI, section 15. Id. at 140-142.
          In concluding that paragraph 6.02 was enforceable, we cited a decision by the Texas
Supreme Court in Beck v. Beck, 814 S.W.2d 745 (Tex. 1991), cert. denied, — U.S. —, 112 S.Ct.
1266 (1992), holding that a substantially similar provision in the prenuptial agreement at issue in
Beck was enforceable, i.e., the income from the spouses' separate property in the bank accounts
mentioned in paragraph 6.02 would be considered to be each spouse's separate property. The
provision in Beck provided:
Notwithstanding that under the laws of the State of Texas the income from respective
separate properties of [the spouses] will be community property, they hereby agree that all
the properties of every kind and nature, real and personal, held or standing in the name of
only one of them shall be considered as a separate property of the one of them in whose
name such property is held or stands, and that only properties, whether real or personal,
held or standing in their joint names shall be considered as community property. 

Beck, 814 S.W.2d at 746.


 This provision in Beck, like paragraph 6.02 in Fanning, successfully
accomplished an exchange of the spouses' community interests in the income derived from the
other's separate property by each party specifically referring to the individual owner of the
separate property which generated the disputed income and correspondingly stating their intention
to characterize such income as the separate property of the owner of the separate estate that
generated it.
          Article XVI, section 15, as this court indicated in Fanning, allows both spouses and future
spouses to "partition" or "exchange" between themselves their individual interests in the
marriage's community property, which means that both spouses and prospective spouses may swap
and/or divide between themselves their interests in the community property acquired or to be
acquired during their marriage. Fanning, 828 S.W.2d at 140-141. However, in construing the
plain language of article XVI, section 15, we held that only spouses, not prospective spouses,
could recharacterize by mere agreement their community interests in the income to be derived
from each other's separate property as separate property, i.e., without a bilateral partition or
exchange. Id. at 141.
          Upon examining the wording of paragraph 6.01, this court found in Fanning that the
parties, as future spouses, were attempting in their prenuptial agreement to do what article XVI,
section 15, forbade them from doing: they were attempting by mere agreement, i.e., without a
partition or exchange, to recharacterize their individual community interests in the income derived
from their separate property as separate property. Id. While the two paragraphs in Fanning at
first glance appear to have accomplished the same goal in a similar manner, they nevertheless must
be treated differently because paragraph 6.01, unlike paragraph 6.02, referenced the language of
the proposed amendment to article XVI, section 15, which concerned the ability of spouses only
to recharacterize by mere agreement their community interests in the income to be derived from
the other's separate property. Fanning, 828 S.W.2d at 141-142; see also Dokmanovic v. Schwarz,
880 S.W.2d 272, 274 (Tex. App.—Houston [14th Dist.] 1994, n.w.h.). The Fannings did not
incorporate into paragraph 6.01 any language to reflect their intention, as prospective spouses, to
partition or exchange their community interests in the income to be generated by each other's
separate property. Fanning, 828 S.W.2d at 141-142. By referencing the language of the proposed
amendment concerning the ability of spouses, not prospective spouses, to partition or exchange
their community interests, the Fannings locked themselves into a construction of their agreement
that they were attempting to do as future spouses what only presently-married spouses could do,
i.e., recharacterize their community interests as separate property by mere agreement.
          Lynda contends that since her agreement with Charles is substantially similar to paragraph
6.01 of the Fannings' prenuptial agreement we are compelled to conclude that her prenuptial
agreement is likewise unconstitutional.


 However, their agreement does not even closely resemble
paragraph 6.01 of the Fannings' agreement. Instead, the Whites' agreement closely resembles the
prenuptial agreement the Fourteenth Court of Appeals found to be enforceable in Dokmanovic, 880
S.W.2d at 273. The parties in Dokmanovic, as prospective spouses, executed a prenuptial
agreement wherein they, among other things, exchanged their community interests in the income
to be derived from each other's separate property.


 Unlike the Fanning agreement, the parties in
Dokmanovic did not expressly reference the language in article XVI, section 15, concerning the
ability of only spouses, not future spouses, to recharacterize their community interests in the
income from separate property by mere agreement. See id. at 274-275. They, like the Whites,
simply used language which reflected an intention to define each other's separate property and to
characterize the income from that separate property as the owner's separate property. Therefore,
because we believe Dokmanovic was properly decided, we conclude that Fanning does not require
a decision in Lynda's favor.
       II.         Whether the Agreement Failed to Accomplish Either a Partition or an                     Exchange

          In answer to Lynda's second contention, we find that the Whites effected an exchange of
their community interests by listing the separate property they both brought into their marriage
and then specifying in the agreement that such separate property, including income derived
therefrom, would continue to belong to their separate estates after their marriage. We further hold
the language in the agreement, indicating the parties' intention to define the separate property each
brought into the marriage, does not mean that they did not intend to exchange their community
interests in the income derived from each other's separate estate. A delineation of each other's
separate property serves not only the purpose, as Lynda would have it, of assisting the parties in
tracing ownership upon dissolution of the marital estate, but allows the parties to determine the
source of the income derived from each other's separate property — an essential task for a
successful completion of an exchange by future spouses of each other's community interests in the
income derived from the other's separate property.
          Lynda points out that the words "partition" and "exchange" are nowhere to be found in the
Whites' agreement; however, we conclude that these words, while helpful, are not essential to
create a partition or an exchange. Charles and Lynda, in executing their prenuptial agreement,
disavowed any interests they might have in the income derived from the other's separate property
enumerated in the agreement.


 See Dokmanovic, 880 S.W.2d at 272 (holding statements in a
prenuptial agreement that income derived from the separate property of the parties would be
characterized as the owner's separate property accomplished a partition or exchange under article
XVI, section 15); see also Winger v. Pianka, 831 S.W.2d 853 (Tex. App.—Austin 1992, writ
denied) (an expression of intention by both parties not to hold any community property
accomplished an exchange as required by article XVI, section 15); Fanning, 828 S.W.2d at 142;
Dewey v. Dewey, 745 S.W.2d 514 (Tex. App.—Corpus Christi 1988, writ denied) (upholding a
prenuptial agreement virtually identical to the Whites', although the court did not rule on the
constitutional issue of partition or exchange); Williams v. Williams, 720 S.W.2d 246 (Tex.
App.—Houston [14th Dist.] 1986, no writ) (same). This mutual disavowal of interests effectively
accomplished an exchange between the two parties of their community interests in the income
derived from the other's separate property.
          Lynda makes the argument that the marked disparity in the value of the separate assets
brought into the marriage by the parties precludes any finding of a partition or an exchange. The
value of the interests exchanged, however, has no bearing upon a valid execution of a partition or
an exchange. See Chiles v. Chiles, 779 S.W.2d 127, 129 (Tex. App.—Houston [14th Dist.] 1989,
writ denied). Article XVI, section 15, requires only that the future spouses partition or exchange
their community interests in order to recharacterize what would be community property as separate
property; no mention is made of a requirement that the values partitioned or exchanged be of an
equal or even proportionate value, and we will not infer one.


 See id.; see also Hibbler v. Knight,
735 S.W.2d 924, 926 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Accordingly, we
conclude that an exchange was effected by Lynda and Charles in their prenuptial agreement. 
          In conclusion, we sustain Charles's point of error and render judgment in his favor.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Reversed and rendered
Opinion delivered and filed March 8, 1995
Do not publish